UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND


PETROLEUM TRADERS CORPORATION        *

                    Plaintiff        *

            v.                       *            CIVIL NO. L-06-444

BALTIMORE COUNTY, MARYLAND,          *
et al.
                                     *

                    Defendants

                    *******

MEMORANDUM

## I.    INTRODUCTION

Three Maryland counties, Baltimore, Anne Arundel, and Harford, formed a buying

consortium called BRCPC.  Through BRCPC, the counties entered into a commodities contract

with plaintiff, Petroleum Traders Corporation ("PTC").  The contract obligated the three counties

to purchase all of their respective gasoline and diesel fuel requirements from PTC for any period

during which the consortium requested a locked-in price for these fuels.  Contending that PTC

was in breach for failing to lock in fuel prices when requested to do so, the counties terminated

the contract.  In response, PTC brought the instant suit.

At the close of discovery, all three counties moved for summary judgment, which the Court

denied.  PTC moved for partial summary judgment against Harford County, which the Court

granted.  Following the summary judgment rulings, Anne Arundel and Harford counties settled,

and the case proceeded to a jury trial as to Baltimore County.   After a five-day trial, the jury

returned a verdict in favor of PTC.  The jury awarded plaintiff $468,726 in damages for breach

of contract plus prejudgment interest, and lost profits totaling $121,670 plus prejudgment interest.

Now pending is Baltimore County's post-trial Motion for Judgment, or, in the Alternative, for New Trial.  Docket No. 192.  For the reasons stated herein, the Motion will, in a separate Order of even date, be DENIED.

At the summary judgment stage, the Court, after a painstaking review of the Baltimore County Code, determined that the County's contract with PTC was technically invalid because two requisite formalities had not been observed.  Docket No. 101.  It bears mentioning that Baltimore County only discovered the irregularity during the instant litigation.  The County did not rely on the irregularity when it repudiated the contract, and the same irregularity affects thousands of other County contracts that it has never sought to disavow.  Moreover, the County does not contend that its contract with PTC, which was awarded in the usual course of business, was procured through fraud, bribery, or mistake.

Because the contract was technically invalid, PTC could not bring a breach of contract claim against Baltimore County.  Nevertheless, the Court ruled at the summary judgment stage that PTC could seek to recover under the doctrine of equitable estoppel.  In order to estop  the County from denying the enforceability of the contract, PTC was required to prove the following three elements:  (i) voluntary conduct or representations by the County, (ii) reasonable reliance by PTC on the County's conduct or representations, and (iii) detriment to PTC.  If PTC shouldered this burden, thereby rendering the contract enforceable, despite its irregularities, then it could recover by proving in addition that (i) Baltimore County breached the contract, (ii) that when Baltimore County breached, PTC was not in default, and (iii) damages.

PTC met this burden at trial.  The Court properly instructed the jury as to the elements

that PTC was required to prove by a preponderance of the evidence.  Through a special verdict

form, the jury found in favor of the plaintiff and awarded damages plus lost profits.  Docket. No.

184., Jury Verdict Form.

The County now seeks to overturn that verdict on two grounds: that the doctrine of

equitable estoppel is inapplicable to contract actions against chartered Maryland counties, and

that the Uniform Commercial Code prohibits PTC from recovering damages in this case.  No

hearing is necessary because the issues have been fully briefed.  See Local Rule 105.6.

## II.    Discussion

### A.    Contractual History

The facts of this case, as established at trial, are as follows.  Between 2004 and 2007, the

County followed a uniform contracting protocol that was memorialized in its contracting

manuals.  Baltimore County's government, including the County's then-Administrative Officer,

Dr. Anthony Marchione, and the County's Director of Budget and Finance, Fred Homan,

believed this protocol to be lawful and proper.  The County followed this protocol to the letter in

forming its contract with PTC.  In this respect, the County's contract with PTC was identical to

the thousands of commodities contracts that the County entered into between 2004 and 2007.  In

2006 alone, the County entered into 5,603 commodities contracts under this uniform protocol.[1]

The protocol was as follows.  Baltimore County, the lead jurisdiction in a commodities

cooperative called the Baltimore Regional Cooperative Purchasing Committee, or BRCPC,

issued "Invitation to Bid No. 204977."  The Invitation solicited bids for the sale and delivery of

---

[1] See Baltimore County's Ans. to Pl. Interrog. No. 6.

gasoline and diesel fuel to meet all of BRCPC's requirements for the contract period.  On March 11, 2004, PTC submitted the lowest bid in response to that Invitation.  On March 15, 2004, David Wolfe, a staff buyer in the County's Purchasing Department, sent a letter to PTC (with copies to BRCPC) informing PTC that it had won the contract.[2]

On April 11, 2004, Baltimore County issued a "Term Contract Award" to PTC, which was signed by Deborah Herbold, a deputy purchasing agent for the County.  The Term Contract Award stated, "This is notice that the contract . . . has been awarded to you."  Under the contract, PTC provided fuel to all three counties, including Baltimore County, from March 29, 2004 until the contract was terminated by the County in December 2005.[3]

The terms of the contract allowed the BRCPC counties to "lock in" fixed prices for fuel for certain time periods.  This so called "lock in" was accomplished in several steps: David Wolfe would obtain from PTC fixed price quotes for gasoline and diesel fuel, BRCPC would then approve the prices, and, finally, Mr. Wolfe would call PTC and direct it to lock in the quoted prices.  At this point, PTC would buy futures contracts for gasoline and heating oil, heating oil being the industry standard analog for diesel futures, off the New York Mercantile Exchange (NYMEX) to guarantee adequate supplies at the lock-in price.  The purchase of the futures contracts was integral to the contract as it ensured PTC could procure fuel for BRCPC at the guaranteed price during the lock-in period.

---

[2] The letter stated, "This letter is sent on behalf of the [BRCPC] to inform you of the award of contract for the purchase of [gasoline and diesel fuel]."  The letter concluded, "Please contact me if you have any questions or concerns regarding this contract."  Pl. Ex. 12.

[3] Baltimore County produced more than 300 pages of individual blanket purchase orders for gasoline and/or diesel fuel purchased from PTC.  Each blanket purchase order was identified with the same contract number, which referenced the contract with PTC.

The contract worked smoothly during the first three lock-in periods elected by the BRCPC counties.[4]  On each occasion, the price of fuel rose above the locked-in price, and the counties benefited by paying below-market prices for gasoline and diesel fuel.

In September 2005, in the wake of Hurricanes Katrina and Rita, oil prices began to rise. Expecting oil prices to continue to rise, Baltimore County, on behalf of the BRCPC counties, requested the fourth lock for the period September 5, 2005 to December 5, 2005 and the fifth lock for the period December 6, 2005 to April 2, 2006.  PTC met its contractual obligation and locked in fixed pricing for these two periods.

Oil prices did not continue to rise, however.  As refinery capacity bounced back more quickly than expected, the pump price of gasoline and diesel fuel began to fall.  During the fourth lock-in period, the retail pump price fell below the locked-in price.

The fact that pump prices were below the locked-in prices caused friction.[5]  One of the counties began breaching the contract by purchasing petroleum from gas stations rather than from PTC.  The same county began making statements to the effect that it would not honor the contract and, instead, would purchase petroleum elsewhere.[6]  The BRCPC counties also requested PTC to renegotiate and threatened to terminate if PTC refused to do so.

---

[4] May 17, 2004 to September 30, 2004; October 1, 2004 to January 31, 2005; and March 7, 2005 to June 30, 2005.

[5] An email from an Anne Arundel County employee to David Wolfe dated November 4, 2005 quantified the impact of the fourth and fifth lock.  Def's Ex. 1.  The email compared current fuel prices with BRCPC's locked-in price and demonstrated that BRCPC was paying an additional $0.64 for every gallon of gasoline and an additional $0.39 for every gallon of diesel. Based on Anne Arundel County's consumption of 130,000 gallons of gasoline and 50,000 of diesel per month, the lock forced Anne Arundel County to pay an additional $102,066  per month in fuel costs than it would have paid at the pump.

[6] As mentioned, the contract was a requirements contract, requiring the BRCPC counties to purchase all of their petroleum requirements from PTC, and obligating PTC to supply those requirements.

Against this background, Baltimore County, on behalf of BRCPC, requested PTC to lock in prices for yet another period.  PTC did not lock in immediately, but sought assurances that all of the BRCPC counties would honor the contract.  PTC also requested an estimate of the gasoline and diesel each county would require.  Baltimore County construed PTC's delay in locking in as a breach of contract.

On December 7, 2005, on behalf of Baltimore County, the County Attorney John Beverungen and the County's Director of Budget and Finance Fred Homan "declare[d] PTC in material default of its obligations in connection with the contract," and terminated the contract.  On December 7, 2005, Harford County terminated the contract for "cause."  Finally, on December 23, 2005, Anne Arundel County terminated the contract for "convenience."  In response to the counties' cascading repudiations of the contract, PTC was forced to liquidate futures contracts for hundreds of thousands of gallons worth of its gasoline and heating oil at an out-of-pocket cost of $468,726.[7]

## B.      Baltimore County's Motion for Summary Judgment

Before litigation commenced, the County never questioned the validity of the contract.  In fact, it invoked the contract's terms (i) to purchase thousands of gallons of fuel for nearly two years, (ii) to lock in fixed pricing on five occasions, (iii) as the basis for finding PTC in material default, and (iv) as justification for the County's termination.

At summary judgment – for the first time – Baltimore County argued that the contract was invalid.  The contract was invalid, the County argued, because the County failed to comply

---

[7] PTC purchased these contracts to accommodate BRCPC's fuel demands for the duration of the fifth lock.

with two legal formalities: (i) neither the Baltimore County Executive nor the Baltimore County Administrative Officer signed the contract, and (ii) the Office of Law did not review and approve the contract.

In a lengthy memorandum, the Court denied the County's motion for summary judgment on September 11, 2008.  Docket No. 101.  On September 22, 2008, the County moved for reconsideration.  Docket No. 103.  On October 3, 2008, the Court, in another substantial memorandum, denied the County's motion for reconsideration.  Docket No. 109.

As discussed in depth in the Court's memoranda, the Court found the contract to be invalid because the better reading of ambiguous County law did require the County to abide by the two formalities.  Nevertheless, the Court held that the doctrine of equitable estoppel would apply, making the contract enforceable, if PTC could prove the elements of equitable estoppel at trial.  Under Maryland law, the Court concluded, equitable estoppel could apply to a chartered county if a threshold condition was met, namely, that county officials acting within the scope of their authority made a reasonable, yet erroneous, interpretation of ambiguous law.  Docket No. 101, Mem. 12-13 (citing Permanent Fin. v. Montgomery County, Md., 308 Md. 239, 250-252 (1986)); see Heartwood 88, Inc. v. Montgomery County, Md., 156 Md. App. 333, 373 (2004). The Court found that this threshold was met: that the County law was materially ambiguous and that County officials, acting within the scope of their authority, interpreted the law both reasonably and erroneously.  Mem. 13.  The Court wrote, "Here, the entire Baltimore County government operated for years under a reasonable interpretation of an unclear statutory scheme." Id. 14.

In lacking two formalities, the contract was like the thousands of other commodities contracts entered into by the County between 2004 and 2007, including 5,603 such contracts in

2006 alone.  For each contract, including the PTC contract, the County adhered to the

requirements of the County's Office of Budget and Finance Purchasing Manual (dated April

2003) and its separate Policies and Procedures Manual (dated February 2003).  In fact, the

County could not produce a single commodities contract that met the legal formalities that it

argued were indispensible.  If equitable estoppel did not apply to this case, the implication of the

County's argument was clear: "[the County] could repudiate—without liability—thousands of

commodities contracts" with faultless vendors like PTC.  See Docket No. 109, Mot. Recons. 3.

### C. Baltimore County's Pending Post-Trial Motion

The County has now filed a post-trial motion seeking judgment as a matter of law under

Fed. R. Civ. P. 50(b) or, in the alternative, a new trial under Fed. R. Civ. P. 59.  The County

presses two points in support of its motion: (1) in a rehash of its summary judgment arguments,

that equitable estoppel cannot apply to a chartered county under these facts, and (2) the Uniform

Commercial Code prohibits PTC from recovering damages in this case.

### 1. Equitable Estoppel

The County argues that it is entitled to judgment as a matter of law on PTC's equitable

estoppel claim for three reasons: (i) according to the County's reading of the Maryland cases, the

doctrine of equitable estoppel is inapplicable to contract actions against chartered counties; (ii)

the jury did not decide whether PTC satisfied the elements of equitable estoppel; and (iii) if the

doctrine of equitable estoppel does apply, then PTC did not prove the elements of equitable

estoppel at trial.  The County's contentions are wholly unfounded.  While the doctrine of

equitable estoppel is applied to counties narrowly to protect taxpayers from debts accrued

through mistake or fraud, that is not the situation here.  The County's contract with PTC simply

was not a product of fraud or mistake, but rather a proper and voluntary contract that the County

now seeks to disavow.

### i.     Equitable Estoppel May Apply to Contract Actions against Chartered Counties

In a third attempt to relitigate an issue decided by the Court at summary judgment,

Baltimore County states that it has "crystalliz[ed]" its interpretation of Maryland case law for the

Court.  Based on its interpretation of Maryland case law, the County contends that equitable

estoppel is wholly inapplicable in contract actions against a chartered county.  This is an

argument by negative implication since no Maryland court has ever stated such a rule.

The County's argument is also incorrect on the law.  See Heartwood 88, Inc. v.

Montgomery County, Md., 156 Md. App. 333, 368 (2004).  In Heartwood, the court found that

Montgomery County was liable for paying interest on tax liens Heartwood purchased from the

County pursuant to the terms of a sales contract.  Therefore, Baltimore County's effort to

"crystallize" its position is unavailing.  Moreover, the County presents no new case law to

change the Court's prior decisions that equitable estoppel is appropriate under the circumstances

presented in this case.

### ii.    At the County's Request, the Court, Not the Jury, Determined that PTC Proved the Elements of Equitable Estoppel

As mentioned, before trial, the County took the position that the contract was invalid and

unenforceable.  During trial, however, the County took the position with the jury that the contract

was binding, and that the County was at all times ready and willing to abide by its terms.  The

County sought to persuade the jury that PTC had breached the contract by refusing to lock in

prices within a reasonable period of time when requested to do so.  This breach, the County maintained, excused it from further performance.

During a charging conference, the Court asked Baltimore County whether it intended during closing argument to reverse itself with the jury by contending  that the contract was never binding on Baltimore County.  The Court observed that the jury would likely find such an argument unpalatable because the County would be contending that it was unreasonable for PTC to have submitted a bid in response to BRCPC's written invitation.  The County responded that it did not wish to make such an argument to the jury, but that it nevertheless wanted to preserve for appeal its twin contentions that (i) equitable estoppel cannot apply to a county, and (ii) that PTC did not meet the elements of equitable estoppel.  The Court accommodated the County by offering to decide the equitable estoppel issue itself, meaning that the issue would be preserved for appeal, but that the County would not be required to reverse itself with the jury.

The County expressly agreed to withdraw the equitable estoppel question from the jury and have the Court decide it.  Subsequently, the Court decided that PTC had satisfied the three elements of equitable estoppel.  The case was, therefore, submitted to the jury on the questions of breach and damages.

In its post-trial motion, the County argues that the Court should not have taken the equitable estoppel issue from the jury.  Because the transcript clearly shows that the County offered to withdraw this issue from the jury, (see Trial Tr., Day 4, 648-59), it cannot now claim error on this point.

### iii.   PTC Proved the Elements of Equitable Estoppel Beyond Peradventure at Trial

The elements of equitable estoppel are (i) voluntary conduct or representations by the County, (ii) reasonable reliance by PTC on the County's conduct or representations, and (iii) detriment to PTC.  Heartwood 88, Inc., 156 Md. App. at 368.  The County argues that the second element, reasonable reliance, was not proven at trial.  The County argues that PTC performed no due diligence – no legal review of the relevant County law – to determine the actual authority of the County employees to enter into the contract.  A failure to conduct any due diligence is unreasonable reliance, the County argues.

This argument is ephemeral and, if credited, would work an injustice.  Baltimore County considered its procurement protocol to be in full compliance with the Baltimore Country Code. The PTC contract was awarded in the ordinary course of business following the accepted protocol.  The County issued a formal Invitation to Bid to which PTC responded.  David Wolfe, a County contracting officer, sent PTC a letter stating that it had been awarded the contract.

Now the County contends that PTC is at fault for failing to parse through the ambiguous provisions of Baltimore County law to discover that, despite all appearances, the contract lacked required formalities.  If this argument were accepted, no company would be safe submitting a bid in response to a county invitation without hiring an attorney to conduct a full scale review of county law.

Assuming PTC had conducted some legal review of the County's contracting protocol, it would have found thousands upon thousands of identical commodities contracts that the County believed to be valid and enforceable.  At trial, Fred Homan, the County's Director of Budget and Finances, stated that in 2004 he believed that the contract was valid because he believed that the

deputy purchasing agent, Deborah Herbold, and/or the staff buyer, David Wolfe, had authority to enter into commodities contracts.  Trial Tr., Day 4, 503.

A stipulation approved by the County on behalf of Dr. Marchione, the County's then-Administrative Officer, stated that he "approved of and consented to Mr. Homan entering into commodities contracts without Dr. Marchione's signature being on them.  Dr. Marchione believed throughout his tenure as administrative officer that Mr. Homan was acting within his authority and conducting the contracting procedures properly."  Trial Tr., Day 4, 586-587.  Finally, Mr. Beverungen, the County Attorney, and Ms. Stroupe, the Assistant County Attorney, both assumed the contract to be binding and enforceable in their December 2005 letter declaring PTC in material default under the contract.

Finally, none of the many other companies that contracted with the County during the relevant time ever raised this issue.  The County does not point to a single company that questioned the legality of the County's protocol.  Thus, PTC did not fail to spot an issue that was evident to others.

## 2.      The Uniform Commercial Code

The County's next attack on the judgment is under the Uniform Commercial Code.  It argues that PTC cannot recover the $468,726 in damages under the UCC, and may only recover lost profits.  This argument is incorrect.

When the County improperly terminated its contract with PTC on December 7, 2005, BRCPC just entered into its fifth lock period (from December 6, 2005 to April 2, 2006).  To supply BRCPC with fixed-price fuel for this period, PTC had purchased a number of futures contracts for gasoline and heating oil (the futures equivalent of diesel fuel).  When the BRCPC

members began to terminate the contract in December 2005, PTC was left holding futures for thousands of gallons of fuel.  To mitigate further losses, PTC resold the futures contracts on the NYMEX.  The resale of these futures resulted in a loss to PTC of $468,726 – a figure presented by PTC's expert Mr. Ashmead Pringle.  This loss would not have been realized had BRCPC continued to perform the contract, that is, had BRCPC continued to purchase fuel from PTC despite the disadvantageous locked-in price.

At trial, PTC elected its seller's damages remedies under UCC § 2-703.  It sought damages based on its commercially reasonable resale of the futures contracts under UCC § 2-706 and lost profits under UCC § 2-708.  The jury expressly decided, by special verdict, that the futures contracts were "the same as or equivalent to" the so called "wet gallons," the goods deliverable under the contract.  Docket No. 198, Final Jury Instr. No. 27; Docket No. 184, Jury Verdict Form.  This means that the futures contracts were resold goods under § 2-706.  On this basis, the jury awarded damages under § 2-706 as well as lost profits under § 2-708.

The jury's damages award is amply supported by the evidence presented at trial.  Under the contract, PTC was obligated to "keep an adequate supply of gasoline and diesel fuel available to fill requirements at all times."  Pl.'s Ex. 5, Invitation to Bid, § 3.2 (emphasis in original).  In order to ensure an adequate supply of fuel at the locked-in price, PTC purchased futures contracts on the NYMEX.  Trial testimony from Ashmead Pringle, PTC's expert witness, established that the futures contracts were entirely fungible with the "wet gallons" of fuel that PTC was required to deliver to the County.  In other words, the futures contracts and the wet gallons were both goods under the contract.  Without these futures contracts, PTC could not have fulfilled its obligation to BRCPC to provide an unlimited amount of fuel at a fixed price during

the lock-in periods.  Accordingly, the purchase of futures contracts was part and parcel of PTC's performance under the contract and essential to its fulfillment of the contract.

### i.      PTC May Recover Damages under UCC § 2-706

The County claims, for several reasons, that damages under § 2-706 are improper.  At the threshold, the Court finds this argument dubious as the only jury instruction the County submitted on the proper measure of damages was expressly based on and cited to § 2-706.  <u>See</u> Docket No. 167, Defendant's Proposed Jury Instr. No. 5.  The County submitted no instruction based on § 2-708 for lost profits.

Nevertheless, the County now claims that PTC is a "jobber," and that jobbers are only entitled to lost profits under § 2-708 and are never entitled to damages under § 2-706.[8]  By labeling PTC a jobber, the County seeks to escape liability without addressing the direct economic harm that its improper termination of the contract caused PTC.  According to White & Summers, <u>Uniform Commercial Code</u>, § 7-10 (5th ed. 2006), a jobber is a term for a middleman who never takes possession of the contract goods.  As a matter of logic, a jobber cannot suffer economic loss greater than its lost profits under a contract because a jobber never holds any inventory to resell.  White & Summers confirms this logic, stating that "the only recovery which grossly approximates the 'jobber's' economic loss is a recovery based on lost profits."  <u>Id.</u>  This common law rule makes perfect sense – jobbers cannot recover damages because they are incapable of incurring damages.

A focus on the County's contract with PTC demonstrates why PTC is not a jobber, at least with respect to this transaction.  The economic reality of the County's improper and

---

[8] The County did file a pre-trial motion in limine making this same argument.  The Court denied the motion, and ruled that PTC could elect its damages remedies under UCC § 2-703 and seek both damages and lost profits.  Docket No. 165, Court's May 6, 2009 Letter Order.

premature termination forced PTC to resell the futures contracts it held as part of its contract with the County, and suffered direct and substantial economic loss as a result.  Accordingly, by putting labels aside and focusing on the economic reality of PTC's losses, the Court concludes that PTC may properly recover damages in this case under § 2-706.

### ii.     PTC's Damages Are Not Consequential Damages

Next, the County argues that the damages awarded by the jury are consequential damages.  This argument is incorrect.  Both the jury and the Court determined that the damages suffered by PTC were direct damages, thus recoverable under § 2-706.  Direct damages "are those which arise naturally or ordinarily from a breach of contract and which . . . can be expected to result from the breach."  Transdulles Center, Inc. v. USX Corp., 976 F.2d 219, 226 (4th Cir. 1992).

The jury made this determination in its special verdict sheet by deciding that the futures contracts were the same as or equivalent to the wet gallons, the goods under the contract.  Under § 2-706, PTC was entitled to resell the futures contracts and recover the difference between the resale price and the contract price.  This is what PTC did, and the jury determined PTC suffered $468,726 in damages as a result.

The Court's interpretation of the contract supports the jury's conclusion, because the futures contracts were essential to PTC's performance under the contract and the fulfillment of its contractual obligations.  Simply put, when the County improperly terminated the contract, PTC was left with futures contracts that were purchased for the benefit of BRCPC and essential to that contract, and which instantly declined in value.  If the County had not prematurely terminated, PTC would not have suffered any loss.  The loss, then, accrued upon the County's

termination, and the resale was incidental.  Accordingly, the damages suffered by PTC are properly recoverable under § 2-706 since they arose directly from the County's breach.

### iii.    The Futures Contracts Are Goods under the UCC

The County's characterization of the futures contracts as "investment securities" is contrary to the facts presented at trial.  As explained above, both the Court and jury determined that the futures contracts were goods under the UCC because they were essential to PTC's performance under the fixed pricing provision of the contract. See Pl.'s Ex. 5, Invitation to Bid, § 3.2.

Next, the County contends that heating oil futures and diesel fuel are analogs, so heating oil futures cannot be goods under the contract.  This is incorrect.  One cannot purchase diesel fuel futures on the NYMEX or any other futures market.  Instead, the industry standard futures contract for diesel fuel is a heating oil futures contract.  PTC's purchase of heating oil futures contracts guaranteed that BRCPC would receive diesel fuel at its locke- in price.  Thus, the jury was correct to conclude that heating oil futures and wet gallons of diesel fuel are fungible analogs and, as such, both goods under the contract.

Finally, UCC § 2-706(4)(a) clearly allows recovery for the resale of futures contracts: "only identified goods can be [re]sold except where there is a recognized market for a public sale of futures in goods of the kind."  Accordingly, the language of UCC § 2-706(4)(a) expressly supports PTC's recovery of damages here.

iv.     PTC's Resale of the Futures Contracts Was in Good Faith and
        Commercially Reasonable in Both Time and Manner

Citing the language of UCC § 2-706(1) and (4), the County argues that PTC's resale of the futures was unreasonable.  The relevant timeline is as follows.  Baltimore County improperly terminated the contract on December 7, 2005.  Harford County terminated on the same date.  On December 9, 2005, PTC sent Baltimore County a letter urging it to reconsider its termination.  Anne Arundel County, which purchased roughly 45% of BRCPC's total gallonage, did not terminate until December 23, 2005.  PTC sold its futures contracts on December 19, 2005 and December 27, 2005.

The jury was directed to award PTC damages only if it determined that PTC resold its futures contracts "in good faith" and that "the time, place, [and] terms" of the resale were commercially reasonable.  See UCC § 2-706(1) and (4).  The jury awarded damages, so it necessarily determined that PTC's resale was in good faith and commercially reasonable.  The County now contests the jury's determination.

Until December 23, 2005, PTC had a viable requirements contract with Anne Arundel County to provide fuel at a fixed price until April 2006.  As of November 2005, Anne Arundel County was taking delivery of 130,000 gallons of gasoline and 50,000 gallons of diesel per month – 45% of the BRCPCs total gallonage.  Once Baltimore and Harford Counties terminated, PTC sold some of its futures contracts within seven business days.  At this point, PTC still had to provide for Anne Arundel County.  Once Anne Arundel County terminated, PTC sold the remainder of its futures contracts within two business days.  The evidence clearly supports the jury's determination that PTC resold its futures contracts in good faith and in a commercially reasonable manner.

17

> **v.      PTC's Resale of Its Futures Contracts on the NYMEX Satisfies UCC § 2-706(4)(b)**

Next, the County argues that the UCC requires PTC to give the County "reasonable notice of the time and place of the resale." UCC § 2-706(4)(b). The purpose of this provision is to prevent the seller from reselling the goods in a disguised manner for an artificially low price. In its papers the County agrees, stating the provision "maximize[s] the probability that a fair sale price will be obtained." Docket No. 209, Def.'s Reply to Mot. for J., 16.

During trial, the Court determined, as a matter of law, that this provision was satisfied because PTC resold the futures on the NYMEX, the largest public market for gasoline and heating oil futures, and such a resale is necessarily commercially reasonable.[9] See Bache & Co., Inc. v. International Controls Corp., 339 F. Supp. 341, 352 (S.D.N.Y. 1972). Bache stands for the proposition that resales on public markets are inherently fair to the breaching buyer and fulfill the purpose of UCC § 2-706(4)(b). This Court agrees with Bache.

Moreover, the County fails to explain what benefit a notice would have provided it. The County does not maintain that it would have objected to the terms of the sale or purchased the contracts itself. Accordingly, PTC's resale satisfied § 2-706(4)(b).

---

[9] The County also knew that PTC intended to resell the securities based on its letter dated December 9, 2005, which stated PTC's intent to "liquidate its futures position[s]." See Pl.'s Ex. 66; see also Richard A. Lord, Williston on Contracts, § 66:35 (4th ed. 2009) ("The Code requirement has been regarded as met under a variety of circumstances in which the buyer knew or should have known of the intended resale.").

### vi.    Perfect Tender Rule

The County argues, for the first time, that the perfect tender rule prevents PTC from recovering damages because heating oil futures are different from diesel fuel (i.e., not a perfect tender).  This argument is waived because the County did not raise it before now.

Putting aside the County's waiver, the argument is inapplicable.  The perfect tender rule applies only to the delivery of goods.  <u>See</u> UCC § 2-601 ("Buyer's Rights on Improper Delivery").  Had PTC delivered heating oil instead of diesel fuel, the County would have an argument.  Had this happened, PTC would still have had an opportunity to cure.  <u>See</u> UCC §§ 2-612; 2-508.  Because PTC never delivered heating oil, the County's argument under the perfect tender rule misses the mark.

## III.    Conclusion

For the reasons stated herein, by separate Order of even date, the Court, on this 14th day of September 2009, will deny the County's post-trial Motion for Judgment, or in the alternative, for New Trial (Docket No. 192).  The case remains closed, and the parties may note an appeal.

_____/s/_____
Benson Everett Legg
Chief Judge
